IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BLUEFIELD DIVISION

ESTIL D. OWENS,

      Plaintiff,

v.                                       Case No.: 1:19-cv-00204

ANDREW M. SAUL,
Commissioner of the
Social Security Administration,

      Defendant.

**PROPOSED FINDINGS AND RECOMMENDATIONS**

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and Memorandum in Support and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 15, 16, 17).

      For the following reasons, the undersigned **RECOMMENDS** that the Court **GRANT** Plaintiff's motion for judgment on the pleadings to the extent that it requests

remand of the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g); **DENY** Defendant's request to affirm the decision of the Commissioner; **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this case, **with prejudice**, and remove it from the docket of the Court.

## I.    <u>Procedural History</u>

In December 2015, Plaintiff Estil D. Owens ("Claimant") filed applications for DIB and SSI, alleging a disability onset date of October 31, 2010 due to "fluid on the brain, vertigo, cardiovascular, diabetes, sleep apnea, neuropathy, herniated disk, coronary artery disease, overweight, blood pressure, high cholesterol, heart [stents] (5), heart attacks (2), kidney stone, [and] throat surgery." (Tr. at 243-54, 271). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 15). Thus, Claimant requested an administrative hearing on his applications for benefits, which was held on June 26, 2018 before the Honorable Nathan Brown, Administrative Law Judge (the "ALJ"). (Tr. at 32-73). By written decision dated July 25, 2018, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 12-31). The ALJ's decision became the final decision of the Commissioner on March 6, 2019 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11). Claimant filed a Motion for Judgment on the Pleadings and Memorandum in Support, and the Commissioner filed a Brief in Support of Defendant's

Decision. (ECF Nos. 15, 16, 17). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 43 years old on his alleged onset date and 51 years old on the date of the ALJ's decision. (Tr. at 23). He completed high school, communicates in English, and previously worked as a school bus driver and nursing assistant. (Tr. at 40, 66).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 31, 2010, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: obesity, idiopathic intracranial hypertension, papilledema, coronary artery disease, diabetes mellitus,

headaches, and cervical spine degenerative disc disease. (Tr. at 17-18, Finding No. 3).

The ALJ also considered Claimant's hypertension and hyperlipidemia, but he found the

impairments to be non-severe. (Tr. at 18).

Under the third inquiry, the ALJ found that Claimant did not have an impairment

or combination of impairments that met or medically equaled any of the impairments

contained in the Listing. (Tr. at 18-19, Finding No. 4). Accordingly, the ALJ determined

that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) and 416.967(b), meaning he can lift or carry twenty
> pounds occasionally and ten pounds frequently, sit for up to six hours in a
> day, stand or walk for up to six hours in a day, and push or pull as much as
> he can lift or carry. However, he can only frequently reach overhead
> bilaterally. In addition, the claimant can occasionally climb ramps and
> stairs, balance, stoop, kneel, and crouch but never crawl or climb ladders,
> ropes, or scaffolds. He can occasionally work at unprotected heights,
> occasionally work with moving mechanical parts, and occasionally operate
> a motor vehicle. The claimant can frequently work in dust, odors, fumes,
> pulmonary irritants, extreme cold, extreme heat, and in an environment
> with vibration. Furthermore, he would be off task no more than nine
> percent of the workday.

(Tr. at 19-23, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform his past

relevant work. (Tr. at 23, Finding No. 6). Therefore, the ALJ reviewed Claimant's past

work experience, age, and education in combination with Claimant's RFC to determine

his ability to engage in other substantial gainful activity. (Tr. at 23-25, Finding Nos. 7

through 10). The ALJ considered that (1) Claimant was born in 1967 and was defined as

a younger individual on the alleged disability onset date, but he subsequently changed

age category to an individual closely approaching advanced age; (2) Claimant had at

least a high school education and could communicate in English; and (3) transferability

of job skills was not an issue because the Medical-Vocational Rules supported a finding

that Claimant was "not disabled," regardless of Claimant's transferable job skills. (Tr. at 23, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a car wash attendant, parking lot booth attendant, and laundry worker. (Tr. at 23-24, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act. (Tr. at 24, Finding No. 11).

## IV.    Claimant's Challenge to the Commissioner's Decision

Claimant asserts numerous challenges to the Commissioner's decision, most of which concern the ALJ's RFC assessment. Claimant contends that the ALJ did not explain the basis for the RFC limitation that Claimant would be off task for nine percent of the workday. (ECF No. 16 at 13). In addition, Claimant argues that the ALJ failed to fully consider in the RFC assessment the evidence concerning his daily activities, limited use of his hands, idiopathic intracranial hypertension, and obesity. (*Id.* at 9-12). Finally, Claimant asserts that the ALJ failed to evaluate whether his idiopathic intracranial hypertension and/or papilledema satisfied the Listing at step three of the sequential evaluation. (*Id.* at 14).

In response to Claimant's challenges, the Commissioner argues that the ALJ properly considered all of Claimant's impairments and the relevant evidence, and he built a logical bridge to his conclusions in the RFC assessment. (ECF No. 17 at 10-19). The Commissioner further contends that Claimant does not identify any evidence to indicate that his idiopathic intracranial hypertension and/or papilledema satisfied a listing, nor does he identify any additional listings that the ALJ should have considered. (*Id.* at 19-20).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

### *A. Treatment Records*

On December 5, 2012, Claimant presented to Carl H. Bivens, M.D., regarding chest pain. (Tr. at 613). He related that he was "at home taking care of his wife," who had a lot of medical problems, but that he could return to work when his wife "g[ot] on disability." (*Id.*). Claimant stated that he drove a school bus, worked as a disc jockey, and sometimes worked at a funeral home. (*Id.*). Dr. Bivens noted that Claimant's review of systems was "actually relatively negative." (*Id.*). He had chest pain, but he denied other issues and "everything seem[ed] to be fine." (*Id.*).

Later that month, on December 21, 2012, Claimant established as a new patient with primary care provider, Mark Clarkson, D.O. (Tr. at 832-37). Dr. Clarkson noted that Claimant did not have any acute problems, he maintained normal activities of daily living, and he denied having a headache or vision problems. (Tr. at 832-33). Claimant was obese, but did not have any edema, and his gait, station, musculoskeletal findings, and neurological examination were normal. (Tr. at 834-35). Dr. Clarkson prescribed medications to treat Claimant's diabetes mellitus, hyperlipidemia, and hypertension. Claimant's review of systems, examination findings, and prescribed treatment during his follow-up appointments with Dr. Clarkson on January 14, 2013 and April 23, 2013 were generally the same as his initial visit. (Tr. at 817-22, 826-831)

Kimberly Daniels, FNP-BC, examined Claimant on March 20, 2014. (Tr. at 812). He complained of almost daily headaches and blurred vision, especially when he turned his head; high blood glucose readings; and high blood pressure. (*Id.*). However,

Claimant admitted that he had not been taking medications for over a year. (*Id.*). Nurse Davis recorded that Claimant had not been treated since April 2013 for his hypertension, diabetes, high cholesterol, coronary artery disease, and history of myocardial infarction. (*Id.*). Claimant stated that he would not have even come to the clinic on the current date, if his wife had not made him. (*Id.*). On examination, Claimant did not have any swelling in his hands, ankles, or feet, and his gait and stance were normal. (Tr. at 813-14). He was prescribed medications for his chronic conditions. (Tr. at 814-15).

On April 23, 2014, Claimant had a diabetic check-up with Sabrina Huffman, FNP-BC. (Tr. at 1149). Claimant complained that he had tinnitus for "quite a while," and it was worse in his right ear. (*Id.*). He was taking his diabetes medications for the past month after being off them for a year, but he still did not monitor his blood glucose. (*Id.*). He stated that he did not "have time" to check it because he took care of his wife and mother-in-law, and it did not leave much time for himself. (*Id.*). His blood pressure was under good control, but he reported blurred vision and occasional "grey patches" in his vision. (*Id.*). Nurse Huffman referred Claimant to specialists for his vision and hearing complaints. (Tr. at 1152).

Claimant presented to Melissa A. Shrewsbury, FNP-BC, an ear, nose, and throat specialist, on May 12, 2014 regarding his complaints of tinnitus. (Tr. at 723). Claimant related that he experienced tinnitus for several years. (*Id.*). Nurse Shrewsbury diagnosed Claimant with pulsatile tinnitus. (*Id.*). She advised Claimant to decrease his caffeine intake, and she ordered a carotid ultrasound. (*Id.*).

On July 11, 2014, Claimant had an appointment with Kristin Youther, FNP-BC, to monitor his diabetes. He was feeling fine. (Tr. at 791). He still reported tinnitus, but he denied cardiovascular, pulmonary, musculoskeletal, or neurological symptoms, and

8

there were no abnormal findings on his physical examination. (Tr. at 791-92). Nurse Youther ordered a magnetic resonance angiography (MRA) of Claimant's brain, because she believed that Claimant's diagnosis of pulsatile tinnitus was not explained by his other laboratory findings. (Tr. at 793). The brain MRA was performed on August 19, 2014 and did not reveal any issues. There was no evidence of mass effect, midline shift, acute ischemic changes, or abnormal focal contrast enhancement. (Tr. at 713).

Claimant followed up with Nurse Youther on February 10, 2015. He was doing well and remained self-reliant in his usual daily activities. (Tr. at 1110-11). He did not have any cardiovascular, pulmonary, or neurological symptoms, and his examination findings were normal, including no edema or headache. (Tr. at 1111-12). The following month, Claimant had a cardiology appointment on March 19, 2015. He continued to have tinnitus related to inner ear dysfunction, but he was noted to be doing "very well." (Tr. at 739). There were no abnormalities on his physical examination, including no edema. (Tr. at 740).

On May 19, 2015, Claimant told Kala White, FNP-BC, during a diabetic check-up that he did not check his blood glucose. (Tr. at 756). He said that he took his medication, so there was "no point." (*Id*.). Claimant reported that his ophthalmologist referred him to the WVU Healthcare Ophthalmology-Eye Institute due to possible nerve swelling in his eye. (*Id*.).

Claimant's presented to ophthalmologist Brian Ellis, M.D., on July 7, 2015. (Tr. at 971). He denied headaches, but complained of blurred vision in both eyes, double vision in his right eye when looking in the distance, and spots and/or floaters in his left eye. (*Id*.). Claimant reported that he had experienced the vision issues for years. (*Id*.). Claimant had a lumbar puncture the following day, which confirmed a diagnosis of

papilledema.[1] (Tr. at 985, 1015). Dr. Ellis prescribed Diamox to treat Claimant's papilledema. (Tr. at 985).

Claimant presented to endocrinologist Renee Schwertfeger, APRN, on August 26, 2015. He was doing "very well" now that he was compliant with medications, so much so that he lost 13 pounds. (Tr. at 1047). On examination, Claimant had a normal gait, no apparent weakness, and no edema in his extremities. (Tr. at 1049). On September 24, 2015, resident physician, Bethany M. Rommel, M.D., examined Claimant in consultation with Dr. Ellis. Claimant had lost 25 pounds in the past six weeks. (Tr. at 1064). However, he complained that the increased dosage of Diamox was causing paresthesias. (Tr. at 1060). During his subsequent visit with Dr. Ellis on November 5, 2015, Claimant reported that there were no changes in his vision, but it still varied. (Tr. at 1066, 1069). He could watch television and read without a problem, but reading street signs was sometimes difficult and his vision was occasionally blurry. (Tr. at 1069). Claimant denied headaches, but he still suffered from tinnitus and had developed a kidney stone, which Dr. Ellis was concerned was related to Diamox. (Tr. at 1066, 1069). Dr. Ellis encouraged Claimant to continue losing weight, and he renewed Claimant's prescription for Diamox. (Tr. at 1069). He also referred Claimant to a urologist, Stanley Zaslau, M.D., regarding the kidney stone. (Tr. at 1071).

Dr. Zaslau examined Claimant on November 9, 2015. Claimant's kidney stone was determined to be small and non-obstructing. (Tr. at 1075). His musculoskeletal and neurological examinations were within normal limits. (*Id.*). Claimant related to Dr. Zaslau that he could walk two flights of steps without shortness of breath or chest pain,

---

[1] Papilledema is the swelling of the optic nerve as it enters the back of the eye due to raised intracranial pressure. https://www.health.harvard.edu/a_to_z/optic-nerve-swelling-papilledema-a-to-z

and he could perform his activities of daily living, which included mowing, weed eating, yardwork, and taking care of his bedridden mother-in-law. (Tr. at 1074).

Claimant followed up with Nurse Schwertfeger on November 30, 2015, and he was feeling well. (Tr. at 1077). He had normal gait, no weakness, and he believed that he might have passed the kidney stone. (Tr. at 1077, 1079). On February 4, 2016, Claimant saw Dr. Ellis. Claimant was still taking Diamox, and his vision was stable with no headaches, double vision, transient obscurity of vision, or further renal stones. (Tr. at 1084). Dr. Ellis noted that Claimant's optic disc edema was very low grade. (*Id.*). On May 10, 2016, Claimant told Nurse White that he rarely monitored his blood glucose, but it seemed to be pretty good when he did check it. (Tr. at 1612).

On October 11, 2016, Claimant was referred to an audiologist, Tara J. Minnix-Harmon, Au.D., for a vestibular ocular motor screen. (Tr. at 1628). He complained that he was off-balance and unsteady, and his vision went "dark" when he tilted his head back to look up. (*Id.*). The testing revealed normal ocular motor abilities, and Claimant's dynamic positioning test was negative. (*Id.*).

Thereafter, Claimant related to Dr. Ellis on March 22, 2017 that he saw grey patches in his left eye, was photophobic, and had problems keeping things focused, but he did not see any flashes of light or floaters. (Tr. at 1232). Dr. Ellis recorded that Claimant's vision was stable, stating that is was "no better or worse." (Tr. at 1236). Dr. Ellis stressed the importance of losing weight and recorded that he was waiting to find out whether Claimant responded to the higher dose of Lasix. (Tr. at 1237).

On April 13, 2017, Claimant was examined by Elizabeth A. Philbrick, APRN, in consultation with neurosurgeon Robert A. Marsh, M.D., regarding chronic neck pain that radiated to his right shoulder pain and left forearm numbness. (Tr. at 1222).

Claimant told the providers that he was a former school bus driver who now cared for his bedridden mother-in-law. (*Id.*). He affirmed that he was independent in his activities of daily living and did not require assistive devices. (*Id.*). He stated that his neck pain resulted from lifting a cooler several years earlier. (*Id.*). He also said that his eyes "[went] black" when he turned his head; he "pass[ed] out" when he looked up; he could hear his heartbeat when his neck hurt; he had constant ringing in his ears; and his hands were constantly numb, but he did not experience any fine motor dysfunction. (*Id.*). Nurse Philbrick referred Claimant to a physical therapist and recommended that he wear wrist splints at night to treat his bilateral hand numbness. (Tr. at 1227). She noted that it was documented that Claimant had bilateral carpal tunnel syndrome, but had never tried conservative therapy. (*Id.*).

On the same date, Claimant saw a resident neurologist, Aisha Qazi, M.D., in consultation with neurologist, Kristina Lopez, M.D., regarding his peripheral neuropathy and carpal tunnel syndrome. Claimant reported that Neurontin improved some of his numbness and tingling. (Tr. at 1258). Dr. Marsh recorded on July 12, 2017 that Claimant had not complied with any of his medical recommendations. (Tr. at 1298). Nonetheless, Claimant was still caring for his bedridden mother-in-law; he had no complaints of headaches or blurry vision; and there were no abnormalities in his physical examination, including full motor strength and normal muscle tone, sensation, reflexes, gait, and station. (Tr. at 1298-99). Claimant could also perform rapid alternating finger to nose movements, he had full grip strength, and his hearing was intact. (Tr. at 1299). Dr. Marsh again ordered physical therapy and recommended wrist splints. (Tr. at 1300). He explained that Claimant's symptoms of muscle fatigue and burning were the result of deconditioning. (*Id.*).

12

On October 24, 2017, Claimant expressed the same vision complaints to Dr. Ellis that he stated at previous appointments, including "black out spells" and his vision "going dark" when he stood up or sat down. (Tr. at 1716). He did not have headaches, but complained of some swelling in his right arm. (*Id.*). Dr. Ellis noted that he would likely recommend optic nerve sheath decompression surgery, if Claimant's vision condition worsened. (Tr. at 1721).

On January 18, 2018, Claimant told Dr. Ellis that he was experiencing more black outs at the frequency of several times per day, and he suffered from double vision and experienced a pressure headache one week earlier that lasted for seven to eight hours. (Tr. at 1797). However, Dr. Ellis concluded that Claimant had overall stable visual function and his diabetes was under better control. (Tr. at 1801). Dr. Ellis wanted Claimant to meet with a nephrologist to evaluate whether he could safely take Diamox for his disc edema given his prior rental stone formation on carbonic anhydrase inhibitors. (Tr. at 1802).

During his follow-up appointment with Dr. Ellis on February 1, 2018, Claimant stated that he had headaches "on and off," but he had a headache since the night before and his head felt swollen to the point that wearing a hat was bothersome. Claimant related that he had not taken any headache medication. His vision was unaffected by the headache, and he denied eye pain, flashes, floaters, or photophobia. (Tr. at 1772, 1776). Dr. Ellis discontinued Claimant's prescription for Lasix and again prescribed Diamox. (Tr. at 1776). Later that month, on February 21, 2018, Claimant underwent a right optic nerve sheath fenestration (ONSF) procedure to relieve his right optic nerve neuropathy and vision loss and his idiopathic intracranial hypertension. (Tr. at 2052-53).

Claimant presented to Lauren Gioia, M.D., for post-operative examination on March 2, 2018. He complained of experiencing constant headaches since surgery and felt that his vision was worse following the procedure. He also reported occasional right ear pain and diplopia in both eyes. (Tr. at 2020). On examination, Claimant's visual field test was stable/improved compared to before his surgery, and he had good central vision. (Tr. at 2025). Dr. Gioia explained to Claimant that ONSF did not typically relieve headaches in the case of idiopathic intracranial hypertension such as his. (*Id.*). She related that she could refer Claimant to a neurosurgeon for evaluation of a ventriculoperitoneal shunt, if headaches were Claimant's main concern, and he could also see a neurologist for headache management. (*Id.*). Dr. Gioia assessed that no urgent intervention was needed given the results of Claimant's visual field test, and she assessed that Claimant's diplopia was likely caused by dry eye related to eye drops that he was using following surgery. (*Id.*). Dr. Gioia adjusted his medications accordingly. (*Id.*).

On May 24, 2018, Claimant's repeat intracranial MRA did not indicate any abnormalities. (Tr. at 2063). His brain MRI was likewise unremarkable other than indicating paranasal sinus disease. (Tr. at 2065). On June 6, 2018, Claimant told Dr. Lopez that he had a daily headache since 2015, and did not have any headache-free hours. (Tr. at 2057). He said that none of his headaches were severe, but he experienced two moderate headaches per week that lasted anywhere between a few minutes and a few hours, and he still experienced blurred vision and tinnitus. (*Id.*). Claimant told Dr. Lopez that his headache pain was triggered by bending forward. (Tr. at 2058). Dr. Lopez noted that the headaches were never positional before and now had migrainous features. (Tr. at 2061). On examination, Claimant had stable gait, no ataxia with finger to nose testing, intact sensation to light touch throughout his body, normal muscle tone, full

14

muscle strength, and normal and symmetric reflexes. (Tr. at 2060-61). Dr. Lopez prescribed topiramate and advised Claimant to avoid caffeine, stay hydrated, exercise, avoid headache triggers such as salt, stick to a routine sleep schedule, and keep a headache diary. (Tr. at 2062). She recorded that Botox was an option, if Claimant's headaches did not improve. (*Id.*).

### B. Opinion Evidence

On April 22, 2016, state agency physician, James B. Smith, M.D., concluded that there was insufficient evidence in the file to assess Claimant's RFC. (Tr. at 77). A second state agency physician, Rabah Boukhemis, M.D., reviewed the record on July 25, 2016 at the reconsideration level of review. Dr. Boukhemis opined that Claimant had the RFC to perform light work with frequent stooping, kneeling, crouching; occasional climbing ramps/stairs and crawling; and no climbing ladders/ropes/scaffolds. (Tr. at 98-99). Dr. Boukhemis explained that Claimant's postural limitations were due to obesity. (Tr. at 99). He further concluded that Claimant should avoid concentrated exposure to temperature extremes, noise, vibration, and fumes, and Claimant should avoid even moderate exposure to hazards. (Tr. at 99-100).

### C. Claimant's Statements

Claimant completed an Adult Function Report on June 14, 2016. He noted that he prepared his own simple meals on a weekly basis, such as sandwiches, soup, and frozen meals, but he no longer prepared big meals, and he was confined to foods that were low in sodium and sugar due to his medical conditions. (Tr. at 304). Claimant wrote that he performed light duty household chores, such as cleaning, doing the laundry, performing household repairs, and mowing on a monthly or weekly basis, but he needed help with weed eating, some household repairs, and "push mowing." (*Id.*). Claimant

stated that he went outside every day, as the weather allowed, and he drove, could go out alone when he left the house, and shopped for light groceries and personal items weekly. (Tr. at 305).

Claimant also testified during his administrative hearing on June 26, 2018. He stated that his vision issues fluctuated based on fluid buildup and pressure. (Tr. at 43). He had a driver's license, but he did not drive "a whole lot" due to headaches, and, on "some days," due to his vision problems and other things. (Tr. at 42). He explained that his wife usually drove him places. (*Id.*). In terms of daily activities, Claimant testified that he spent most of the time in his bedroom because he was irritable and tried to "joke a lot and a lot of people [couldn't] take his joking." (Tr. at 44). He stated that he mowed his small yard using a riding mower because when he tried to mow, do yard work, or use a weed eater, he could only work for a few minutes before needing a 30-minute break. (Tr. at 50). Claimant stated that upon exertion he would become out of breath, his head would swell, his back hurt, and he would have chest pains. (*Id.*). Claimant testified that his physician was still treating his intracranial pressure with medications and trying to avoid implanting a shunt. (Tr. at 53). He said that he still had tinnitus, his hands tingled, and he had carpal tunnel syndrome. (Tr. at 54, 56). According to Claimant, it was hard to use his hands, he dropped his pills often, and he could not pick the pills up from the floor half of the time when he dropped them. He was no longer helping to care for his bedridden mother-in-law, who previously lived next door. (Tr. at 57). Claimant explained that the family put her in a nursing home because "she was getting worse and worse to where you couldn't get her turned and stuff in the bed." (Tr. at 58).

## VI.    <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is

based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to ensuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  Discussion

Claimant raises numerous challenges to the Commissioner's decision. The alleged errors primarily relate to the ALJ's RFC analysis, and one argument concerns the ALJ's step three finding. The challenges are discussed below, in turn.

### A. RFC

Claimant argues the ALJ did not explain the basis for the RFC limitation that he would be off task for no more than nine percent of the workday. He further contends the ALJ did not fully consider in the RFC assessment the evidence concerning his daily

17

activities, limited use of his hands, idiopathic intracranial hypertension, and obesity. SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id*. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id*. at *3.

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id*. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id*. at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*. at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were

considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

### 1. Off task restriction

Claimant asserts that "nowhere in the decision" did the ALJ explain the basis for the RFC assessment that he would be off task no more than nine percent of the workday, nor did the ALJ explain how he arrived at that precise figure. (ECF No. 16 at 13). Upon review of the ALJ's decision, the undersigned agrees that the ALJ did not provide sufficient explanation or support for this RFC limitation. Indeed, the ALJ did not provide any meaningful analysis of Claimant's ability to remain on task at all. While the ALJ discussed Claimant's allegations, physical impairments, and pain, he did not articulate which impairments or symptoms caused Claimant to be off task, much less did the ALJ provide a basis for the specific assessment that Claimant would be off task for no more than nine percent of the workday. Rather, the ALJ erroneously proceeded straight from his discussion of the medical record to the off-task limitation without building any logical bridge from evidence to conclusion. *Thomas*, 916 F.3d at 311; SSR 96-8p.

Moreover, the assessment that Claimant would be off task for no more than nine percent of the workday is not reflected in any treatment note, medical opinion, or in Claimant's statements, such that the ALJ's reasoning could be extrapolated from the

record. The ALJ gave great weight to the RFC opinion of Dr. Boukhemis, who did not assess an off-task limitation. (Tr. at 22, 98-100). The Commissioner argues that the ALJ gave Claimant "every benefit of the doubt and afforded even greater limitations than Dr. Boukhemis, which included a percentage for time off task, to account for [Claimant's] headache and vision complaints." (ECF No. 17 at 19). However, the Commissioner is simply providing a *post hoc* explanation for the ALJ's decision. The ALJ did not state that the off-task limitation related to Claimant's headaches and vision complaints. Thus, the Commissioner's statement is nothing more than conjecture. As noted, the ALJ did not provide any substantive explanation for the off-task restriction. The assessed limitation may very well be appropriate in Claimant's case, but the Court cannot meaningfully review the ALJ's decision without knowing its basis and the evidence supporting it.

While an ALJ is not obligated to base each conclusion in the RFC assessment on a specific piece of evidence, an ALJ must consider all relevant evidence in the record and arrive at a determination of a claimant's RFC that is supported by substantial evidence. *Fruit v. Colvin*, No. 2:14-CV-07643, 2015 WL 1021309, at *22 (S.D.W. Va. Mar. 9, 2015); 20 C.F.R. § 404.1545(a)(1); SSR 96–8p, 1996 WL 374184, at *5. In performing that task, the ALJ must also reconcile conflicting evidence. Here, the ALJ stated that Claimant's intermittent chest pain due to coronary artery disease, neck pain, and type two diabetes mellitus have persistently bothered Claimant since his alleged onset date, and vision issues, followed by headaches, were also present. (Tr. at 22). However, the ALJ found that, despite those conditions, Claimant's daily activities were not as limited as one would expect given Claimant's alleged disabling symptoms. (*Id.*). The ALJ further remarked upon Claimant's "conservative medical treatment," "mild to moderate

abnormalities on diagnostic imaging," generally unremarkable physical examinations, visual issues that were mostly correctible with glasses, and treatment for headaches that was minimal other than the right ONSF surgery. (Tr. at 23). Notwithstanding this purportedly benign evidence, the ALJ included an off-task limitation in the RFC finding. Without knowing the basis for the RFC conclusion, the Court cannot determine whether it is supported by substantial evidence. *See, e.g., Conary v. Berryhill*, No. 2:18-CV-01228, 2019 WL 3216041, at *8-10 (S.D.W. Va. June 25, 2019), *report and recommendation adopted sub nom. Conary v. Saul*, 2019 WL 3211268 (S.D.W. Va. July 16, 2019) (recommending remand where the ALJ did not explain the basis for the assessment that the claimant would be off task for no more than five percent of the workday); *Fisher v. Comm'r, Soc. Sec.*, No. RDB-17-3165, 2018 WL 3348858, at *3 (D. Md. July 9, 2018), *report and recommendation adopted,* 2018 WL 5309788 (D. Md. Aug. 1, 2018) (recommending remand where the ALJ did not provide any explanation or support for the "extremely specific conclusion" in the RFC assessment as to how often and how long the claimant needed breaks due to being off task); *Carter v. Berryhill*, No. 2:17-CV-04399, 2018 WL 4381275, at *12 (S.D.W. Va. Apr. 11, 2018), *report and recommendation adopted,* 2018 WL 4169108 (S.D.W. Va. Aug. 30, 2018) (recommending remand where the ALJ "left the court to guess" how the ALJ arrived at the conclusion that the claimant would be off task for 15 percent of the workday).

In addition, the ALJ's lack of discussion can hardly be considered harmless error in this case. The ALJ questioned the VE during the administrative hearing, "[a]t what point does a person's off task time preclude employment." (Tr. at 69). The VE responded, "[a]nything greater than 9% of the workday." (*Id*.). Clearly, the off-task limitation directly impacted the ALJ's decision that Claimant could perform substantial gainful

activity; consequently, the ALJ was obligated to sufficiently explain the basis for his assessment in this functional domain. *See, e.g., Fisher*, 2018 WL 3348858, at *3 (stating that an explanation of how the ALJ determined the percentage of time that the claimant would be off task was significant because a relatively small increase could preclude competitive employment).

Therefore, because the ALJ's RFC discussion lacks sufficient analysis and explanation to support the ALJ's conclusion that Claimant would be off task for no more than nine percent of the workday, and the undersigned cannot conclude that the ALJ's error was harmless, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reconsider or elaborate on the off task limitation in Claimant's RFC.

### 2. Daily activities

Claimant next argues that the ALJ did not properly consider his daily activities in the RFC assessment. (ECF No. 16 at 9). He notes that the ALJ found that Claimant's ability to cook, shop, drive, and mow his small lawn suggested that Claimant could perform light exertional work. However, Claimant contends that the ALJ disregarded contrary evidence, such as the fact that he did not prepare big meals anymore, but rather only prepared simple meals that took a few minutes on a weekly basis. (*Id*.). Claimant also points out that he expressed that he needed assistance with weed eating and push mowing, and he could only use a riding mower. (*Id*. at 10). Finally, Claimant notes his statements that he only shopped for light groceries and personal items once per week for less than 20 minutes at a time. (*Id*.).

Reviewing this challenge to the ALJ's decision, Claimant does not point to any

errors in the ALJ's analysis of his daily activities, and Claimant indeed expressed in his June 2016 Adult Function Report that he prepared his own simple meals; performed light duty household chores, such as cleaning, laundry, household repairs, and mowing; went outside every day; drove; could go out alone; and shopped for light groceries and personal items. (Tr. at 304-05). In July 2017, Claimant also told his medical provider that he was still helping care for his bedridden mother-in-law. (Tr. at 1298).

Therefore, the ALJ did not consider any functions or daily activities that Claimant could not actually perform. Claimant simply asks the Court to reevaluate his credibility finding and RFC, which is not the Court's role in reviewing the Commissioner's decision. To the extent that Claimant simply disagrees with how the ALJ weighed such evidence and the ALJ's conclusion that such activities indicated that Claimant could perform a range of light level work, "[u]nder the Social Security Act, [a reviewing court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." *Vest*, 2016 WL 5334668, at *2 (quoting *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001)) (alteration in original); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). The Court should not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary" and, if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the Court must defer to the Commissioner's decision. *Id.* (citations omitted). For those reasons, the undersigned **FINDS** that the ALJ's analysis of Claimant's daily activities complied with the law and was supported by substantial evidence.

### 3.  Manipulative impairment

Claimant next argues that the ALJ failed to discuss, or even recognize, his complaints of difficulty using his hands due to tingling. However, in the RFC assessment, the ALJ specifically considered Claimant's complaints of diabetic neuropathy in his hands, and the tingling in his hands as a side effect of medication. (Tr. at 20). In assessing whether the alleged symptoms resulted in any functional loss, the ALJ noted that Claimant's musculoskeletal system was normal on physical examination in July 2017. (Tr. at 22). Claimant's neurosurgeon, Dr. Marsh, recorded during that visit that Claimant had full motor strength and normal muscle tone, sensation, and reflexes. (Tr. at 1298-99). Claimant could perform rapid alternating finger to nose movements, and retained full grip strength. (Tr. at 1299). The ALJ also gave great weight to the July 2016 opinion of Dr. Boukhemis, who concluded that Claimant did not have any manipulative impairments. (Tr. at 22, 99). Therefore, the ALJ very clearly considered the relevant evidence, and his conclusion that no greater RFC limitations were warranted as a result of Claimant's hand symptoms is supported by the record. The undersigned **FINDS** that the ALJ's RFC analysis of Claimant's manipulative impairment complied with the law and was supported by substantial evidence.

### 4.  Idiopathic intracranial hypertension

Claimant contends that the ALJ's RFC analysis of his idiopathic intracranial hypertension was inadequate, stating that "nowhere did [the ALJ] discuss particular medical observations and findings, and how those relate to the specific functional limitations or abilities for the RFC." (ECF No. 16 at 11). At step two of the sequential evaluation, the ALJ concluded that Claimant's idiopathic intracranial hypertension and papilledema were severe impairments. (Tr. at 17). In the RFC analysis, the ALJ noted

Claimant's complaints of "fluid on his brain," pressure behind his eyes, and associated headaches. (Tr. at 20). The ALJ discussed the treatment records and noted that Claimant underwent a right ONSF procedure in February 2018 to address idiopathic intracranial hypertension. (Tr. at 21-22). The ALJ considered that Claimant continued to suffer blurred vision and headaches following the surgery, but his intracranial radiological and physical examination findings were normal in May 2018, and he was continued on medications with the possibility of Botox injections in the future. (*Id.*). The ALJ noted that, despite Claimant's vision issues and headaches, Claimant maintained a variety of daily activities, and the ALJ gave significant weight to the RFC limitations assessed by Dr. Boukhemis. (*Id.*). Overall, the ALJ found that, despite Claimant's medical impairments that affected him on a persistent basis, the evidence showed that he was capable of performing a reduced range of light work. (Tr. at 23). The ALJ based his conclusions on Claimant's relatively conservative medical treatment, mild to moderate abnormalities on diagnostic imaging, and generally unremarkable physical examinations, as well as the fact that his vision issues appeared to be mostly correctible with glasses and the fact that his treatment for headaches was minimal other than his ONSF procedure. (*Id.*).

Claimant does not identify any evidence or functional abilities that the ALJ overlooked relating to his idiopathic intracranial hypertension. While Claimant might disagree with the ALJ's analysis and conclusions, he does not identify any error in the RFC assessment regarding this condition. As shown above, the ALJ considered the relevant evidence and articulated a thorough, well-reasoned analysis that is supported by the evidence in the record. For all of the above reasons, the undersigned **FINDS** that the ALJ's RFC analysis of Claimant's idiopathic intracranial hypertension complied with

the law and was supported by substantial evidence.

### 5. Obesity

In his final criticism of the ALJ's RFC assessment, Claimant argues that the ALJ did not demonstrate that he considered Claimant's obesity. (ECF No. 16 at 12). However, the ALJ found that Claimant's obesity was a severe impairment at step two of the sequential evaluation. (Tr. at 17). At step three, the ALJ considered Claimant's obesity as an aggravating factor to his other severe impairments, and the ALJ evaluated whether his obesity, in combination with his other impairments, would meet a listing in compliance with Social Security Ruling 02-1p. (Tr. at 18). In the RFC analysis, the ALJ discussed Claimant's allegations that his obesity limited his ability to work. (Tr. at 20). The ALJ analyzed the evidence related to Claimant's obesity, but noted Claimant's generally unremarkable physical examinations, variety of daily activities, relatively conservative medical treatment, mild to moderate abnormalities on diagnostic imaging, and Dr. Boukhemis' RFC opinion that Claimant could perform a reduced range of light work. (Tr. at 20-23). As the ALJ referenced, Claimant maintained through 2018 stable gait with no ataxia, no ataxia with finger to nose testing, intact sensation to light touch throughout his body, normal muscle tone, full muscle strength, and normal symmetric reflexes. (Tr. at 2060-61). Again, Claimant fails to show any critical records, conflicting evidence, or relevant functional abilities that the ALJ did not address regarding this impairment. Therefore, the undersigned **FINDS** that the ALJ's RFC analysis of Claimant's obesity complied with the law and was supported by substantial evidence.

### B. Step Three Finding

Regarding the ALJ's step three finding, Claimant argues that the ALJ failed "to consider the potential listing level impairments for [his] idiopathic intracranial

hypertension and/or papilledema. (ECF No. 16 at 14). A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. *See* 20 C.F.R. §§ 404.1525, 416.925. The Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background; consequently, the criteria defining the listed impairments is set at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). Because disability is presumed with a listed impairment, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet all of the specified medical criteria." *Id.* at 530. If the claimant is unable to demonstrate that his impairments, alone or in combination, match the criteria of a particular listed impairment, the claimant may still establish disability by showing that his impairments are medically equivalent to the listed impairment.

To establish medical equivalency, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a specific listed impairment. *Id.* at 530; *see also* 20 C.F.R. §§ 404.1526, 416.926. In Title 20 C.F.R. §§ 404.1526, 416.926, the SSA sets out three ways in which medical equivalency can be determined. First, if the claimant has an impairment that is described in the Listing, but (1) does not exhibit all of the findings specified in the listing, or (2) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical

significance to the required criteria. *Id.* §§ 404.1526(b)(1), 416.926(b)(1). Second, if the claimant's impairment is not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a closely analogous listed impairment. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). Finally, if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings; if the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* §§ 404.1526(b)(3), 416.926(b)(3). "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment … A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan,* 493 U.S. at 531. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

In this case, the ALJ concluded, with appropriate analysis and citations to the record, that Claimant's impairments, alone or in combination, did not meet or equal the criteria in the listings related to disorders of the spine, visual impairments, chronic heart failure, or ischemic heart disease. (Tr. at 18-19). The ALJ also evaluated whether Claimant's obesity contributed to his other conditions to potentially meet a listing, and the ALJ considered whether Claimant's headaches met or medically equaled the severity

criteria for any listing related to neurological disorders. (*Id.*). Claimant fails to point to any specific evidence, or any listing, that his idiopathic intracranial hypertension and/or papilledema purportedly met or medically equaled. Given the fact that Claimant offers no further explanation, and upon review of the decision, the undersigned **FINDS** that the ALJ's step three decision is supported by substantial evidence.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for judgment on the pleadings, (ECF Nos. 15, 16), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 17); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District

Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** April 17, 2020

Cheryl A. Eifert
United States Magistrate Judge